FILED
MAY 15 2009

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

STEPHEN HEPOLA,

              Plaintiff,

    v.

MICHAEL J. ASTRUE, Commissioner of Social Security,

             Defendant.

CV-07-1773-PK

FINDINGS AND RECOMMENDATION

PAPAK, Magistrate Judge:

    Plaintiff Stephen Hepola challenges the Commissioner's decision denying his applications for disability insurance benefits and supplemental security income payments under Titles II and XVI of the Social Security Act. The court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). The Commissioner's decision should be affirmed.

    Hepola alleges he became disabled January 1, 2002, due to epilepsy. Admin. R. 65-66, 73, 492. The administrative law judge ("ALJ") applied the five-step sequential disability determination process described in 20 C.F.R. §§ 404.1520 and 416.920. *See Bowen v. Yuckert*, 482 U.S. 137, 140

1 - FINDINGS AND RECOMMENDATION

(1987). At step three of that process, the ALJ found Hepola failed to prove his impairment satisfied the criteria for any of the presumptively disabling conditions enumerated in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Listing of Impairments"). The ALJ concluded Hepola retains the residual functional capacity to perform a wide range of light work, including jobs which exist in significant numbers in the national economy. Admin. R. 23-25.

The court reviews that decision to ensure that proper legal standards were applied and the findings are supported by substantial evidence in the record. 42 U.S.C. § 405(g); *Batson v. Comm'r of Soc. Sec. Admin.,* 359 F.3d 1190, 1193 (9th Cir. 2004). Hepola challenges the ALJ's evaluation of the medical reports of two neurologists, his own statements about his symptoms, and the statements of his wife. Hepola argues this evidence, if given proper weight, would establish the criteria in the Listing of Impairments for presumptively disabling epilepsy.

### I. <u>Listing of Impairments</u>

At step three of the decision-making process, the regulations apply a conclusive presumption that the claimant is disabled if the ALJ determines that the claimant's impairment is equivalent to "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." *Yuckert,* 482 US at 140-41; 20 C.F.R. §§ 404.1520(d), 416.920(d). The criteria necessary to establish the presumptively disabling impairments are enumerated in the Listing of Impairments. The claimant has the burden of proving that he satisfies the criteria for a listed impairment. *Sullivan v. Zebley,* 493 U.S. 521, 531 (1990).

Hepola contends the ALJ erred by failing to find his seizure disorder satisfies the criteria for Listing 11.02 (*convulsive epilepsy*) and/or Listing 11.03 (*nonconvulsive epilepsy*). The criteria for Listings 11.02 and 11.03 can be applied "only if the impairment persists despite the fact that the

individual is following prescribed antiepileptic treatment." Listing of Impairments § 11.00A. Adherence to prescribed treatment can be determined from objective findings of treating physicians and serum levels of prescribed anticonvulsant medications. *Id.*; SSR 87-6, 1987 WL 109184, *3. The ALJ found Hepola did not consistently comply with his prescribed medication regimen. Admin. R. 21. Regular laboratory screening revealed blood levels of his prescribed anticonvulsant medications outside their therapeutic ranges. *Id.* at 170, 171, 180, 211, 214, 217, 241, 246, 248, 262, 280, 282, 283, 286, 288, 300, 315-16, 318-19, 323, 324-26, 339, 341, 355, 375, 418. Hepola admitted poor compliance during the relevant time but reportedly became more reliable when he reestablished care with Robert Rosenbaum, M.D., in January 2006. *Id.* at 401, 482, 487.

Hepola argues his subtherapeutic blood levels of medication were beyond his control and resulted from his individual idiosyncrasy in absorption or metabolism. He cites records from his incarceration at Clackamas County Jail as evidence that even in a highly supervised setting, doctors were unable to maintain therapeutic blood levels. *Id.* at 264, 272. This argument is contrary to his own admission to jail physicians that he was noncompliant with prescribed medications, even in that highly supervised setting. *Id.* at 280, 281, 283. The ALJ reasonably concluded that Hepola's serum levels of medication reflected poor compliance with prescribed treatment and not an idiosyncratic absorption rate. The court must uphold the ALJ's rational findings of fact, even if evidence exists to support more than one rational interpretation. *Batson,* 359 F.3d at 1193; *Andrews v. Shalala,* 53 F.3d 1035, 1039-40 (9th Cir. 1995).

After his release from jail, Hepola received emergency treatment for seizures from time to time. For example, in August 2005, Hepola was hospitalized after a period without medications. Restarting Dilantin and Depakote "stopped his seizures completely and immediately." Admin. R.

3 - FINDINGS AND RECOMMENDATION

315. Hepola did not maintain an ongoing relationship with a treatment source, however, until he reestablished care with Dr. Rosenbaum in January 2006. Such a relationship is essential to a determination that seizures persisted despite adherence to prescribed treatment. SSR 87-6, 109184, *2. Accordingly, Hepola failed to show that he regularly adhered to prescribed treatment from the alleged onset of disability at least until he reestablished care with Dr. Rosenbaum in January 2006. *Id.* at 401-03.

To meet the criteria for the epilepsy listings, a claimant must demonstrate the requisite frequency of seizures. To meet the criteria for Listing 11.02, a claimant must show that he experiences major motor (grand mal) seizures more frequently than once a month for three months while on prescribed medications. To meet the criteria for Listing 11.03, a claimant must show that he experiences minor motor (petit mal) seizures more frequently than once weekly in spite of compliance with prescribed treatment for at least three months. SSR 87-6, 1987 WL 109841, *3.

After reestablishing with Dr. Rosenbaum, Hepola continued to have small myoclonic spells in the early mornings before taking his medications and Dr. Rosenbaum started a third anticonvulsant medication, Keppra, to address the small seizures. Admin. R. 395. In August 2006, Hepola reported his myoclonic spells were "stopped 98%" and infrequent episodes were associated with missed doses of medication. *Id.* at 389. In December 2006, Hepola reported that Keppra had stopped his small seizures. *Id.* at 386. In February 2007, Hepola again reported myoclonic spells at a frequency of two to three per week. *Id.* at 376. These medical records reasonably suggest Hepola did not have the frequency of small seizures required for Listing 11.03 while compliant with his Keppra prescription for a sufficient duration to meet the listing prior to the ALJ's April 2007 decision.

In May 2006, during his reportedly improved compliance, Hepola told Dr. Rosenbaum he had not had a grand mal seizure in months. *Id.* at 394. In December 2006, Hepola told Dr. Rosenbaum he had experienced seven grand mal seizures in the preceding four months, mostly while sleeping. *Id.* at 386. These records show that Hepola did not have the frequency of grand mal seizures required for Listing 11.02 in the first half of 2006, although the frequency reportedly increased later in the year. Notably, Hepola's serum levels of Dilantin and Depakote were subtherapeutic when measured in January 2007 after his reported recurrence of grand mal seizures. *Id.* at 408, 418. Indeed, the contemporaneous treatment records described his medication compliance as only fair and his serum drug levels rarely showed all three medications in the therapeutic range. *Id.* at 376, 383-85, 408, 418.

Even assuming Hepola adhered to prescribed treatment after January 2006, and demonstrated the required frequency of seizures, he still must show that the seizures resulted in functional limitations of sufficient severity to meet the listings. To satisfy Listing 11.02, a claimant's major motor seizures must occur during the day and cause loss of consciousness and convulsions, or occur during the night and cause residual effects which interfere significantly with activity during the day. Listing of Impairments, § 11.02. To meet Listing 11.03, a claimant's minor motor seizures must cause alteration of awareness or loss of consciousness and transient postictal manifestations of unconventional behavior or significant interference with activity during the day. *Id.* § 11.03.

The ALJ found the medical evidence did not show daytime episodes with loss of consciousness and convulsive seizures or night time episodes with residuals causing significant interference with activity during the day. Admin. R. 21. This conclusion is supported by substantial evidence. When Hepola reported a recurrence of myoclonic spells in February 2007, he reported

5 - FINDINGS AND RECOMMENDATION

greatly diminished symptoms of a jolt sensation, racing heart, and a feeling of warmth. He had no loss of awareness and recovered within two to three minutes. *Id.* at 376. His grand mal seizures occurred primarily during sleep and on awakening in the morning, Hepola felt tired and had sore muscles. *Id.* Based on these reports, Hepola failed to demonstrate the functional limitations required for Listings 11.02 or 11.03. Hepola argues the requisite functional limitations are established by the reports of Dr. Rosenbaum and Norman So, M.D., his subjective statements, and the statements of his wife.

Hepola reestablished care with Dr. Rosenbaum in January 2006 after a 10-year hiatus. *Id.* at 401. Dr. Rosenbaum followed Hepola for seizure treatment during 2006. Examinations in January, May, and August 2006, showed steady improvement in the frequency and severity of Hepola's seizures associated with his compliance with a three-medication treatment regimen. *Id.* at 389-90, 394-96, 401-03. In December 2006, Hepola told Dr. Rosenbaum his seizures were no longer controlled and Dr. Rosenbaum referred him to Norman So, M.D., a neurologist specializing in epilepsy. *Id.* at 378, 386.

On February 20, 2007, Dr. Rosenbaum completed a questionnaire, indicating Hepola had "no limitation of motor skills — able to do all physical activities fine, but at risk of seizures." *Id.* at 487. Dr. Rosenbaum opined that Hepola should avoid heights and moving machinery. *Id.* at 489. He did not indicate any other functional limitations. The ALJ accepted the limitations in Dr. Rosenbaum's opinion. *Id.* at 23. Contrary to Hepola's argument, Dr. Rosenbaum's opinion does not support functional limitations sufficient to meet the listings.

Dr. So began to follow Hepola on January 10, 2007. Hepola reported his minor motor seizures had improved in frequency and severity to the point that he felt the sensation of a seizure

occurring, but did not lose awareness or fall, and recovered over a period of two to three minutes. His major motor seizures occurred only at night and he awakened feeling tired with sore muscles. *Id.* at 376, 378. On February 12, 2007, Dr. So completed a questionnaire regarding the limitations in work-related functions he believed Hepola had as a result of his epilepsy. Dr. So indicated no functional limitations. *Id.* at 482-86. The ALJ accepted Dr. So's opinion and it is consistent with her decision. Contrary to Hepola's argument, Dr. So's opinion does not support the presence of the functional limitations required to meet the listings.

The opinions of Drs. Rosenbaum and So are consistent with the report of neurologist Tatsuro Ogisu, M.D. Dr. Ogisu performed a comprehensive neurology examination in May 2005. At the time, Hepola claimed compliance with his medication regimen, but his serum levels of medication indicated otherwise. Even without control of his seizures, the only functional limitations Dr. Ogisu indicated were a restriction against driving and standard seizure precautions against hazards. *Id.* at 346. These findings are also consistent with the opinion of the agency reviewing medical expert, who indicated the primary work-related restriction for Hepola was that he must avoid even moderate exposure to hazards. *Id.* at 356-63. In summary, the medical evidence does not support the functional limitations required to satisfy Listings 11.02 and/or 11.03.

Hepola and his wife provided written statements indicating that after a grand mal seizure, he is too exhausted to do anything, including personal care. He spends the day in bed and his memory and concentration are affected. *Id.* at 99, 103, 111, 115, 135, 140. These statements were dated in 2005 when Hepola's serum levels of medication were subtherapeutic and before he reestablished a treatment relationship with Dr. Rosenbaum. It is reasonable to conclude that they do not describe his limitations while adhering to prescribed treatment.

Hepola testified that nocturnal grand mal seizures usually cause him to sleep later and leave him feeling drained and weak. *Id.* at 530. Hepola's wife provided testimony indicating similar limitations. *Id.* at 536.

The ALJ found the allegations of Hepola and his wife about the limiting effects of his seizures not entirely credible. *Id.* at 23. An ALJ must provide clear and convincing reasons for discrediting a claimant's testimony regarding the severity of his symptoms. *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993). *See also Smolen v. Chater*, 80 F.3d 1273, 1283 (9th Cir. 1996). The ALJ must make findings that are "sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony." *Orteza v. Shalala*, 50 F.3d 748, 750 (9th Cir. 1995).

When making a credibility evaluation, the ALJ may consider objective medical evidence and the claimant's treatment history as well as any unexplained failure to seek treatment or follow a prescribed course of treatment. *Smolen*, 80 F.3d at 1284. The ALJ may also consider the claimant's daily activities, work record and the observations of physicians and third parties in a position to have personal knowledge about the claimant's functional limitations. *Id.* In addition, the ALJ may employ ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms and other statements by the claimant that appear to be less than candid. *Id. See also* SSR 96-7p.

The ALJ considered these factors and concluded the allegations of Hepola and his wife regarding the limiting effects of his symptoms were not supported by the record. Admin. R. 23. With respect to work-related limitations from minor motor seizures, the ALJ accepted only that Hepola should take precautions against hazards due to the risk he might have such a seizure at work. The

8 - FINDINGS AND RECOMMENDATION

ALJ found Hepola's minor motor seizures under control with current medications, and this is supported by the medical evidence indicating his partial seizures were brought under control when he began appropriate treatment with Keppra. In fact, Hepola testified that his petit mal seizures were controlled by Keppra. *Id.* at 520-24.

As described previously, Hepola's treatment history includes extended periods of noncompliance with prescribed treatment. His reports to treating physicians did not include the severe exhaustion and cognitive limitations affecting memory, understanding, and concentration alleged by Hepola and his wife. It is reasonable to expect a patient experiencing disabling symptoms to report them to treating sources and to comply with treatment designed to alleviate those symptoms. Accordingly, the ALJ could reasonably draw an adverse inference as to credibility from these factors. *Bruton v. Massanari,* 268 F.3d 824, 828 (9th Cir. 2001).

The ALJ considered the opinion evidence from Drs. Rosenbaum, So, Ogisu, and the agency medical consultant. As described previously, none of these physicians indicated Hepola required assistance with personal care, had deficits in memory, understanding, or concentration, and needed to stay in bed all day after a seizure. Hepola argues these opinions should be interpreted as describing his capabilities in the absence of seizures. Even if these opinions could be rationally interpreted in the manner Hepola urges, the ALJ's interpretation is not irrational and should be upheld. *Batson,* 359 F.3d at 1193; *Andrews,* 53 F.3d at 1039-40.

Hepola's work record also supports the ALJ's conclusion. Hepola testified that his grand mal seizures began when he was 16. *Id.* at 525. Despite these seizures, Hepola worked as a metal plater, general laborer, forklift driver, auto detailer, and food service restaurant worker before the alleged onset of disability in January 2002. After the alleged onset of disability, he worked for several

9 - FINDINGS AND RECOMMENDATION

months as a framer and auto detailer. There is no evidence that he stopped working at any of these jobs due to the limitations alleged by Hepola and his wife. An ALJ can draw an adverse inference as to credibility when the claimant alleges disabling symptoms but stops working for non-medical reasons. *Bruton*, 268 F.3d at 828. Hepola testified that he lost his last job because he could not get a driver's license. *Id.* at 515, 533. He submitted a 2007 Driver Medical Report suggesting his inability to drive stems from his seizure disorder. *Id.* at 508-09. He admitted, however, that at the time he quit working, he had lost his driver's license after multiple convictions for driving while intoxicated. *Id.* at 514-18.

In summary, the ALJ considered appropriate factors and drew reasonable inferences from substantial evidence in the record in assessing Hepola's credibility. Her decision is sufficiently specific to show that she did not arbitrarily discredit his allegations regarding the daytime limitations resulting from his nocturnal seizures.

Hepola argues the ALJ did not articulate adequate reasons for discounting the statements of his wife. An ALJ cannot disregard the testimony of a lay witness without comment, but must give reasons that are germane to the witness. *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir 1996). It is clear from the ALJ's decision that she considered the similar allegations of Hepola and his wife together and reached the same conclusion regarding their credibility based on the same considerations. The reasoning is germane to both.

In summary, the ALJ reached the conclusion that Hepola failed to establish the functional limitations required for Listings 11.02 and/or 11.03 after considering proper factors and drawing reasonable inferences from substantial evidence in the record. Accordingly, the ALJ's conclusion should be upheld.

10 - FINDINGS AND RECOMMENDATION

## II. <u>Vocational Evidence</u>

Hepola contends the ALJ erred at step five of the decision-making process by relying on faulty vocational evidence. At step five, the Commissioner must show that significant numbers of jobs exist which the claimant can perform. *Andrews*, 53 F.3d at 1043. An ALJ can satisfy this burden by eliciting the testimony of a vocational expert ("VE") with a hypothetical question that sets forth all the limitations of the claimant. *Id.; Osenbrock v. Apfel*, 240 F.3d 1157, 1163-65 (9th Cir. 2001).

Hepola contends the ALJ's conclusion is erroneous because she elicited testimony from the VE with a hypothetical question that did not contain the limitations alleged in his and his wife's statements regarding daytime exhaustion and deficits in memory, understanding, and concentration. As described already, the ALJ did not find these allegations credible. An ALJ is not required to incorporate limitations based on evidence that she properly discounted. *Batson*, 359 F.3d at 1197-98; *Osenbrock*, 240 F.3d at 1164-65.

The ALJ considered all the evidence and framed her vocational hypothetical question based on the limitations supported by the record as a whole. The VE testified that a significant number of jobs exist that can be performed by a person with the limitations described in the hypothetical question. Admin. R. 543-44. Accordingly, the ALJ's conclusion is supported by substantial evidence.

## RECOMMENDATION

For the reasons set forth above, the Commissioner's decision should be AFFIRMED and judgment should be entered accordingly.

## **SCHEDULING ORDER**

The above Findings and Recommendation will be referred to a United States District Judge for review. Objections, if any, are due May 29, 2009. If no objections are filed, review of the Findings and Recommendation will go under advisement on that date. If objections are filed, a response to the objections is due within 10 days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation(s) will be referred to a district court judge and go under advisement.

IT IS SO ORDERED.

DATED this 15th day of May, 2009.

_____
Paul Papak
United States Magistrate Judge